CurraN, Dennis J., J.
MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF’S MOTION FOR PARTIAL SUMMARY JUDGMENT’[1]
DDJB Real Estate Holdings, LLC has sued the prospective tenant of one of its properties, the Church of Scientology of Boston, Inc. On July 11, 2014, DDJB and the Church signed a three-year lease which recited an August 1, 2014 move-in date and provided that the Church would be responsible for any expenses related to any move-in delays caused by it. Just a month later, the Church repudiated the lease, citing a delay in the move-in date and the odor of a nearby transfer station as its reasons for doing so. Because the summary judgment record contains uncontro-verted evidence that the Church knew, before signing, that the actual move-in date could be later than originally anticipated, DDJB is entitled to summary judgment as to its breach of contract claim. (Count I.) However, because there remains a question of material fact as to whether the Church’s “motive in terminating the [lease] was to affect negatively the plaintiffs rights,” T.W. Nickerson, Inc. v. Fleet Nat’l Bank, 456 Mass 562, 574 (2010), summary judgment must be denied as to DDJB’s claim for breach of the covenant of good faith and fair dealing. (Count II.)
BACKGROUND
In the fall of 2013, the Church was seeking to move out of its then-current headquarters at 448 Beacon Street in Boston, Massachusetts, under an agreement by which it sold that property to The Congress Group, Inc. That agreement required the Church to vacate the Beacon Street location by August 23,2014, extendable for an additional 180 days at a set fee of $250,000, or if the Church failed to timely extend, at a per diem charge of $5,700 for use and occupancy.
In January 2014, the Church’s Executive Directors, Graham Parker and Heather Landrey, viewed a potential rental property owned by DDJB at 112-114 Gerard Street in Boston, Massachusetts.[2] On March 27, 2014, the Church’s real estate broker, Gary McCourt, provided DDJB with a letter of intent to rent the property. That letter proposed a five-year lease to commence on July 1, 2015 and requested that DDJB build out the “raw” space into rooms for the Church’s use. On March 28th, Mr. Parker agreed to and accepted the letter on behalf of the Church, on a signature line designated “(d]uly authorized to sign.” Joint Appendix, Exhibit 10. DDJB promptly signed the letter of intent and returned it to the Church sometime before March 31st.
On April 3rd, DDJB provided an initial draft lease with a proposed start date of August 1, 2014 and requested that the Church identify its decision-maker for the terms of the build-out. The parties continued to negotiate for several weeks, including the Church’s April 14th proposal of a second letter of intent, which DDJB declined to sign. On May 5th, DDJB informed Mr. McCourt that it could not commit to a budget and timeframe for the build-out until the Church indicated the precise nature of the facilities it needed and received bids for that work. It also sent a proposed version of the Lease, which included the following term related to construction delays:
[SJhould [the Church] be deemed to have cause[d] delay in approving or designing the interior work, the occupancy date may be delayed, however [DDJB] will not be responsible for any temporary space, penalties or any other financial cost the [Church] may encounter due to the delay of occupancy. [DDJB] understands time is of the essence and will make all efforts to get the [Church] in on August 1st.
Exhibit 17.
On May 7th, DDJB emailed Mr. McCourt a timeline for further agreements and planning regarding the lease and the build-out, including a proposal that the Church sign the lease and provide a “ [f]ull list of decision makers and point of contact” no later than May 9th. DDJB also informed Mr. McCourt that any delay in the proposed schedule would likewise delay the construction process.[3] That same day, the Church forwarded the lease to its national and international management personnel in Los Angeles and New York, whose permission it required before signing. It also forwarded a memorandum from its attorney, Marc LaCasse, which stated in pertinent part: “Time is of the essence since the build out of the space must *351 commence almost immediately to ensure that it is ready for occupancy by August 1, 2014.” Exhibit 19. In addition, on May 12th, DDJB emailed Mr. McCourt directly and informed him that the then-three days’ delay in signing the lease, compared to the schedule proposed on May 7th, was “already going to delay the build out and move in.” Exhibit 20. On May 19th, Ms. Landrey also emailed Mr. McCourt, acknowledging that the Church had hoped to have the lease signed the previous week and indicating that they were attempting to extend their tenancy at the Beacon Street location.
More than two weeks later, on June 4th, Mr. Parker informed DDJB that the Church would not sign the lease without an estimated budget for the build-out, but that he could be approved to sign within twenty-four hours of receiving an estimate. The same day, Biyan Jasper, a Regional Property Development Director for the Church in New York, also contacted DDJB seeking an estimated budget. On June 5th, DDJB provided an estimated budget of $500,000 and put Mr. Jasper, Mr. Parker, and Ms. Landrey in contact with its architect. On June 10th, DDJB informed the Church that it would not seek a building permit for the build-out until the Church signed the lease.
Finally, on July 4th, the Church informed DDJB that it had received permission to sign the lease, and on July 11th, Ms. Parker signed it on behalf of the Church. On July 15th, DDJB’s architect indicated that it would take up to two weeks to secure the building permits, and thereafter, a minimum of six weeks to complete the build-out. On July 24th, Ms. Landrey emailed the Church’s upper management, confirming that the build-out would not be completed until October 1st and stating, “This is 100% due to the comm[unication] lag on the lines for the building proposal and lease which took [mjonths to get approved instead of weeks . . . There was enough time to do the whole construction cycle if the lease approval had been handled in a timely fashion." Joint Appendix, Exhibit 33. (Emphasis added.)
On August 9th, Ms. Landrey received a text message from a member of Church’s upper management, indicating that the Church would not be moving into the property, but instead would seek a longer term location where it could remain until construction was completed on a new headquarters. On August 11th, Mr. McCourt informed DDJB that the Church would not move into the property. Two days later, Attorney LaCasse sent DDJB a letter stating that the Church was terminating the lease because the build-out was not complete and also “in large part due to the stench present in the area surrounding the [property] caused by the transfer facility which is nearby.” Exhibit 35. On August 18th, the Church asked DDJB if it would be willing to amend the lease for a firm, “drop dead move-in date” of October 1st. Exhibit 37. However, on August 17th, the Church had already signed a lease for a properly in Quincy, Massachusetts. Indeed, it completed its move to that location on August 23, 2014.
DISCUSSION
The moving party bears the burden of showing that there is “no genuine issue of material fact and that [it] is entitled to judgment as a matter of law.” Madsen v. Erwin, 395 Mass 715, 719 (1985). It may meet this burden “either through affirmative evidence or by showing an absence of evidence to support an essential element of the nonmoving party’s claim.” Dennis v. Kaskel, 79 Mass.App.Ct. 736, 741 (2011), citing Flesner v. Technical Communications Corp., 410 Mass. 805 (1991). In considering such a motion, the court must view the facts, and the inferences that can reasonably be drawn from them, in the light most favorable to the nonmoving party. Coveney v. President & Trustees of the College of the Holy Cross, 388 Mass. 16, 17 (1983).
I. Breach of Contract
Although the material facts are many, at its heart, this case rests on a simple question: whether the provision in the lease absolving DDJB of responsibility for move-in delays caused by the Church applies only to delays arising after the lease was signed, or whether it also applies to those potential delays already known to the parties at the time of signing. The interpretation of an unambiguous contractual provision is an issue of law appropriate for resolution by the court. 116 Commonwealth Condominium Trust v. Aetna Cos. & Sur. Co., 433 Mass. 373, 376 (2001).
It is undisputed both that the build-out of the property was not completed by August 1st, as initially contemplated by the lease, and that after the signing the lease, the Church informed DDJB that it would not occupy the property. The Church contends that DDJB was the first to breach the lease, because the August 1st move-in date was a critical term of the deal, due to the heavy fees the Church would incur if it failed to vacate its Beacon Street location timely. However, the Church’s contention that the delay provision was intended to apply only to delays arising after the signing of the lease is unpersuasive, where the Church was notified before it signed that any delay in signing would delay its move-in date; and where it was notified a full month before it finally signed that DDJB would not apply for building permits (and thus, could not begin construction) until the Church signed the lease.
The Church further attempts to support its interpretation by arguing that the reason or one of the reasons for the delay in signing the lease was that it required reassurances from DDJB that despite the delay in signing, DDJB would complete the build-out before the Church incurred penalties at its then-present location. However, DDJB warned the Church as early as May 12th—nearly two full months before the Church eventually signed the lease—that any delay in *352 signing could concomitantly delay the move-in date. In fact, the Church’s own representatives admitted repeatedly in contemporaneous correspondence that the Church was causing delays unanticipated by both its own representatives and by DDJB at the time the latter agreed to the August 1st move-in date. Thus, on this record, it cannot be disputed that before signing the lease, the Church was fully aware that it was already causing delays that could affect the move-in date, for which DDJB would not accept responsibility.
Moreover, the Church cannot relieve itself of liability by attempting to raise an issue of material fact related to alleged fraudulent inducement by DDJB. Such a claim would require at least some evidence that DDJB made a statement to the Church that “misrepresent[ed] the actual intention of [DDJB] and w[as] relied upon by the [Church] to [its] damage.” McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 709 (1990). In this case, the summary judgment record indicates that throughout the course of the parties’ dealings, DDJB represented to the Church that it would make all efforts to complete the build-out by August 1st, but that it would not accept responsibility for any delays in completion caused by the Church; indeed, this was precisely the substance of the delay provision in the lease ultimately signed by the parties. The Church has offered no evidence to the contrary, apart from the unfortunate fact that DDJB was, in fact, not able to complete the build-out. Accordingly, the Church’s defensive claim must fail. DDJB is entitled to summary judgment as to Count I.
II. Breach of the Covenant of Good Faith and Fair Dealing
When faced with a claim for breach of the covenant of good faith and fair dealing, a defendant’s motives must be examined to determine whether it acted with an absence of good faith relative to the plaintiffs rights under the lease. While there is strong evidence that the Church’s representatives’ conduct in this matter was less than forthright—particularly Ms. Landrey’s admission that the Church’s decision to seek another location was related solely to its own convenience—such evidence is nonetheless insufficient for this court to grant DDJB summary judgment as to Count II, because all reasonable inferences at this procedural stage must be drawn in favor of the Church. Ms. Landrey’s admission would allow a jury to infer that the Church’s statement regarding the odor from the transfer station was a pretext, but there remains the possibility that a jury might infer, alternatively, that Ms. Landrey was simply unaware of the complete rationale behind the Church’s decision. Therefore, a thin genuine issue of material fact remains as to whether the Church acted with an improper motive in terminating the lease. Accordingly, summary judgment must be denied as to Count II.
CONCLUSION AND ORDER
The summary judgment record is clear. The extensive course of dealing between the parties before the signing of the lease mandates that the delay provision be given full effect, and applied to the delays in the move-in date which the Church has admitted delayed the signing of the lease. At the same time, the competing inferences to be drawn as to the Church’s motive in breaching the lease constitute a genuine issue of material fact that must be resolved by a future trier - of-fact. Accordingly, the plaintiffs motion for summary judgment is ALLOWED as to Count I of the first amended complaint, but DENIED as to Count II.

 The plaintiffs original motion is entitled “Plaintiffs Motion for Summary Judgment.” However, the defendant’s opposition is styled “Opposition to Plaintiffs Motion for [Partial] Summary Judgment,” which designation the plaintiff adopts in its “Reply to Defendant’s Opposition to Plaintiffs Partial Motion for Summary Judgment.” Therefore, and upon review of the substance of the motion, the court adopts the parties’ terminology, but recognizes that the plaintiff seeks summary judgment as to all issues of liability.

 The Church disputes this and many other factual allegations by claiming that there is no evidence in the summary judgment record of written correspondence between the parties regarding the relevant issue of fact. In doing so, the Church attempts to unjustifiably circumscribe the forms of summary judgment evidence permitted under Mass.R.Civ.P. 56, which explicitly contemplates the parties’ use of, and the court’s reliance upon, affidavits submitted by individuals with personal knowledge of the matter at hand. In this and all other such instances, the court deems admitted the facts alleged in the parties’ affidavits and uncontested by any other evidence in the summary judgment record.

 The Church takes pains to point out that although it does not dispute the contents of the email, DDJB’s statement “does not prove that deviating from these dates would, in fact, delay the process.” Consolidated Statement of Material Facts, paragraph 10. This purported dispute is immaterial, because there is no evidence in the summary judgment record that DDJB was being other than candid with the Church or that its representation was incorrect or inaccurate.